## APPROPRIATION OF NAVIGABLE WATER FRONT RIGHTS BY A MUNICIPALITY.

Circuit Court of Cuyahoga County.

JOHN G. WHITE AND CHAS. N. WHITE v. CITY OF CLEVELAND, AND FIVE OTHER CASES.[*]

Decided, November 27, 1911.

*Eminent Domain—Appropriation by Municipality of Lands on the Lake Shore for Park Purposes—Easement Only Acquired—Riparian Rights and the Right to Build Piers Included—Underlying Rights of Former Owners—Further Compensation May Be Demanded for the Imposing of Additional Burdens—Constitutionality of Act Providing for Conversion of Park to Railway Uses—Authority to Lease Piers and Appurtenances to Transportation Companies—But such Action May Be Enjoined if Attempted before Underlying Rights Are Acquired.*

1. The city of Cleveland having, in 1872, appropriated for park purposes certain lands bordering on Lake Erie, thereby acquired an easement for park purposes in the shore and the riparian rights appurtenant thereto, which include the right to wharf out and make land to the limit of navigability, unless prevented by the state; having made land without interference by the state, the made land is affected by the same easement for park purposes with which the shore lands are affected, as are also any piers built out in front of the made land.

2. Under the amendment to the municipal code adopted in 1906 (98 O. L., 164), the city has the right to perfect its title in fee simple absolute to both the shore lands and the made lands and piers, by condemnation proceedings providing for the payment of compensation for the underlying right of property to those who were the owners of the lands at the time they were appropriated for park purposes in 1872, or their successors in interest.

3. Said act of 1906 authorizes the city to appropriate the said underlying right of property for park purposes, *plus* the right to sell, lease or exchange the lands to a railroad or railroads for depot purposes, if the same are suitable for the location of a railroad passenger station.

[*] Affirming, with slight modification, *White* v. *Cleveland,* 12 N.P.(N. S.), —.

4. Said act of 1906, though it authorizes the completion of the title to the park property for the purpose of turning over part of it to the railroads for depot purposes, is constitutional, and it is no objection to the councilmanic proceedings authorizing the re-appropriation, that the councilmen had the latter purpose in mind when they voted to complete the title "for park purposes" only.

5. The act of 1910 (101 O. L., 236) is a valid enactment, and authorized the city to lease piers in front of said park for use for passenger or freight carriers, with buildings and appurtenances necessary to such use, and it is no objection to the councilmanic proceedings authorizing the completion of the title to said lands and piers under the act of 1906, that the councilmen had in mind to so lease said piers when they voted to complete the title "for park purposes" only.

6. A lease of said piers entered into between the city and navigation companies, pursuant to said act of 1910, before the city had completed its title thereto by appropriation of the underlying rights of property, pursuant to said act of 1906, will be enjoined at the suit of a tax-payer or one owning said underlying right of property.

*White, Johnson & Cannon, C. A. Neff, Squire, Sanders & Dempsey* and *Luther Day,* for plaintiffs.

*N. D. Baker, Golder, Holding & Masten* and *Frank E. Stevens,* contra.

WINCH, J.; MARVIN, J., and HENRY, J., concur.

Heard on appeal.

In these cases we are asked to enjoin the city of Cleveland from appropriating certain so-called reversionary interests in the lands of Lake View Park for the ostensible purpose of perfecting its title in fee simple to said lands for park uses, but really for the purpose, as it is claimed, of selling about thirty-five acres of said lands to the railroads for depot purposes, and from leasing a pier or dock in front of said park, near the extension of East Ninth street, to the navigation companies.

For these purposes, four suits were originally brought in the court of common pleas, two by tax-payers, one addressed against the appropriation proceedings, and one against the lease of the pier, and two by owners of reversionary rights, one against the appropriation proceedings and one against the lease of the pier.

By separate appeals of various parties interested, these four common pleas cases have become six cases in this court.

The lands of Lake View Park, originally appropriated in 1872, lie on the side hill fronting Lake Erie, for a distance of over 2,000 feet, between Erie, now East Ninth street, on the east, and Seneca, now West Third street, on the west, and extending from Summit avenue on the top of the hill at the south, to the right-of-way of the Cleveland & Pittsburgh Railroad Company at the bottom of the hill on the north, an area of about nine acres, which, in these proceedings, have been called the uplands; next north of the Cleveland and Pittsburgh right-of-way is the right-of-way of the Lake Shore Railroad Company, at that time nearly at the waters edge, and by the same proceedings all the property *north* of the Lake Shore right-of-way was appropriated, it being then a narrow strip of land, but a few feet in width. In 1894 the city of Cleveland put in a row of sheet piling and bulk heads parallel to the shore in front of the park and over 1,000 feet out in the lake, and established a public dumping ground there, so that since said date the same has been filled in, and there are now about ninety-nine acres of made land in front of the upland.

In front of this made land, as an extension of East Ninth street, the city has built a pier 100 feet wide, extending out 713 feet to the harbor line established by the United States Government in 1898. Two hundred feet west of this pier is another pier of the same dimensions, whch is the pier the city has undertaken to lease to the navigation companies.

The claims of plaintiffs with reference to the rights and title of the city in the premises, as acquired by the appropriation proceedings of 1872, are as follows:

"The claim of plaintiffs in all four suits is that the appropriation proceedings of 1872, the city acquired only an easement for park purposes in Lake View Park, including the uplands; that by appropriating an easement for park purposes in the shore, it at the same time appropriated for park purposes the riparian rights which were appurtenant to the shore; that these riparian rights included the right to wharf out, to make land to the limit of navigability, unless prevented by the state; that the city appropriated this right for park purposes; and having made land by the exercise of this riparian right without interference by the state, the made land was affected by the same easement for park purposes with which the upland was affected; that the piers are but a portion of the made land. Having the right to

fill out the entire land to the harbor line, unless prevented by the state, the city had the right to fill out so much of it as it desired for this purpose, and its rights were neither lessened nor increased by the fact that it did not fill it out uniformly, but made part into piers and left part water."

For the reasons and upon the authorities cited by counsel for plaintiff in his brief, we conclude that the above recited claims are well founded.

As to the rights in the property which were not taken by the appropriation, and which in these cases are represented by the so-called reversioners, their claims are that "the word 'easement' presupposes an underlying right of property in somebody else than the owner of the easement. What is the nature of that property, whether it is to a reverter or a right to additional compensation in case of change of use, or only a right to prevent the change of use is immaterial."

The city, by procuring an amendment to the appropriation laws in 1906, recognized that as the law stood in 1872, it acquired only an easement for park purposes in the lands appropriated, and that if its title to the lands was to be enlarged, additional compensation would have to be made to the owner of the "underlying right of property."

The amendment referred to is found in 98 O. L., 164, and as the city is proposing to proceed under that act, to perfect in itself a title in fee simple, and its appropriation proceedings thereunder are the proceedings here sought to be enjoined, it is necessary to examine the purpose and effect of the said amendment.

The law, as amended, is now found in General Code, Sections 3679, 3680, 3681, 3690, 3691, 3692, 3699, 3700, 3701 and 3702.

Said act reads as follows:

"Section 1.   That Sections 12, 13, 18 and 24 of an act passed October 22, 1902, entitled, 'An act to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit so as to prevent the abuse of such power as is required by the Constitution of Ohio and to repeal all sections of the Revised Statutes inconsistent herewith,' be amended to read as follows:

"Sec. 12.   Whenever it is deemed necessary to appropriate property, council shall pass a resolution, declaring such intent,

defining the purpose of the appropriation, and setting forth a pertinent description of the land, *and the estate or interest therein desired to be appropriated;* and for water works purposes the council may appropriate such property as it may determine to be necessary; and immediately upon the passage of such resolution, declaring such intent, for which but one reading shall be necessary, the mayor shall cause written notice thereof to be given to the owner, person in possession thereof, or having an interest of record·in, every piece of property sought to be appropriated, or to his authorized agent, and such notice shall be served by a person designated for that purpose, and return made in the manner provided by law for the service and return of summons in civil actions, and in case said owner, persons or their agents, can not be found, notice shall be given by publication once a week for three consecutive weeks in a newspaper of general circulation in the corporation, and council may thereupon pass an ordinance by the votes of two-thirds of all members elected thereto, directing said appropriation to proceed.

''Sec. 13.    Upon the passage of the aforesaid ordinance, the solicitor shall make application to the court of common pleas or to a judge in vacation, to the probate court, or to the insolvency court, in the county in which the lands sought to be taken is located, which application shall describe as correctly as possible the land to be appropriated, *the interest or estate therein to be taken,* the object proposed, and the name of the owner of each lot or parcel thereof.

''Sec. 18.    The court shall make such order as to payment, deposit or distribution of the amounts assessed as may seem proper, may require adverse claimants to all or any part of the money or property to interplead and fully determine their rights in the same proceeding and may direct the time and manner in which possession of the property condemned shall be taken or delivered, and may, if necessary, enforce any order giving possession; *and upon the payment or deposit, by the corporation, of the amount assessed, as ordered by the court, an absolute estate in fee simple shall be vested in said corporation, unless a lesser estate or interest is asked for in the application, in which case such lesser estate or interest as is so asked for shall be vested; and any municipal corporation shall have the power to again appropriate, in conformity with the provisions of this act, any real estate which it has previously, lawfully appropriated, in order to perfect, in it, a title in fee simple absolute to such previously appropriated real estate.*

''Sec. 24.    No contract for the sale or lease of any real estate shall be made unless authorized by an ordinance, approved by the votes of two-thirds of all members elected to the council and

by the board or officer having supervision or management of such real estate, and when such contract is so authorized, it shall be made in writing by the board or officer having such supervision or management and only with the highest bidder, after advertisement once a week for five (5) consecutive weeks in a newspaper of general circulation within the corporation, provided that such board or officer may reject any or all bids and readvertise until all such real estate is sold or leased, as the case may be: *provided, that whenever any city owns real estate suitable for the location of a passenger railroad station, and council shall by ordinance declare that it is necessary that such land be devoted to such use, it shall be competent for such city to sell or lease or exchange such land to such railroad or railroads for such purpose in the following manner: An ordinance authorizing and directing the mayor of the city to deed or lease the land shall be passed; council shall fix in such ordinance by metes and bounds the amount of land to be sold, leased or exchanged, the quantity of interest sold, leased or exchanged, and the consideration to be paid or exchanged therefor by such railroad or railroads, and in such ordinance shall call thereon a special election, to be held upon a day fixed by said ordinance not less than thirty (30) days from the passage thereof, and a majority of all the votes cast on such proposition shall be necessary to its ratification, and when so ratified, said ordinance shall be effective, and the mayor shall proceed to execute a deed of conveyance or lease of said property as therein provided, and in holding such special election, the provisions of Section 2837, Revised Statutes, shall apply.*

"Section 2.    That said original Sections 12, 13, 18 and 24 be and the same are hereby repealed.".

The amendment consisted in inserting the words given in italics.

Manifestly the purpose and intent of this legislation was to change the law of the state, as theretofore announced by the courts, and to provide that instead of the municipality acquiring only an *easement* when it appropriates property for a particular purpose, it shall acquire *an absolute estate in fee simple, unless a lesser estate or interest is asked for in the application.*

That the Legislature has a right to change the law upon this subject, in so far as it applies to proceedings thereafter to be brought, there can be no doubt.

But, it is said, that the city of Cleveland, having once appropriated the lands in question for park purposes, has the full and

complete use and enjoyment of the same for said purposes and has no need to appropriate for the same purpose the underlying rights of plaintiff reversioners. (It should be remarked here that the proceedings sought to be enjoined are for the appropriation of the reversioners' rights, as stated in the resolution and application therefor, "for park purposes.")

This brings us to a consideration of the purpose and effect of that part of the last section of the act, now found as General Code, Sections 3700, 3701 and 3702.

The whole act must be construed together and so construing it, it is perfectly apparent that the Legislature intended that appropriation should be authorized for the purpose defined in the resolution and the object proposed in the application, *plus* the right to sell, lease or exchange the lands appropriated to a railroad or railroads, for depot purposes, if the same should be suitable for the location of a passenger railroad station.

This gives a specific or good reason or purpose for the pending appropriation, although it is not required by the statute to be stated in the resolution or application, for the power to sell, lease or exchange is found in the chapter of the municipal code referring to the sale or lease of property, while the provisions regarding appropriation proceedings are found in the preceding chapter, yet the municipality has a right under the act quoted, to appropriate for any of the purposes *expressed* in General Code, Section 3677, with the *implied* right of dominion over the property after its acquisition set forth in Sections 3700, 3701 and 3702.

In other words, the last three sections may be read into Section 3677. It was not placed there by the Legislature, because it applies not only to property appropriated, but to that acquired in other ways.

A study of the act of 1906 confirms the suggestion of counsel for plaintiff that its enactment was procured by the city of Cleveland for the very purpose of getting rid of the rights of reversioners in Lake View Park, or acquiring them, so that the city might dispose of part of said park to the railroads for depot purposes.

Was there anything unlawful in this legislation, prohibited by the Constitution?

As already stated, one purpose of the Legislature was to change the law with regard to the nature of the title vested in the city by appropriation and to make it a fee simple. So far as this affects property thereafter appropriated, it is a valid enactment.

Another purpose was to perfect or complete the title to land already held under appropriation; this was brought within the Constitution by providing compensation to the owners of the underlying rights.

Another purpose was to authorize cities owning the fee simple title to real estate suitable for the location of a depot to declare the necessity that such land be devoted *to such use,* and to sell, lease or exchange it *for such purpose.*

The use here stated is for a public purpose. Railroads and depot companies are authorized to appropriate lands for such purposes. The great efforts required and immense sums of money expended in providing suitable terminal and depot facilities in our large cities, testify to the public importance of such conveniences.

The record of these cases is full of a recognition of the public importance of a new depot in Cleveland by the city council and executive officials and civic organizations. General Manager Moon, of the Lake Shore Railroad, with the shrewd insight of a business man, spoke of "such a station as apparently the people want and the railroads think is quite beyond the railroad's necessities."

By reason of the large amount of land now needed for such purposes in large cities, and the convenience of having depots as near the center of the city as possible, it is manifest that sites for such depots can rarely be acquired without including therein public property, property of the city at an earlier date naturally devoted to some other public purpose, but, by reason of the city's and the railroads' growth, now peculiarly adapted to depot purposes.

It will be noticed that Section 3700 limits the use of the land sold to a public purpose; this is a *dedication* to that use; "the municipality may sell, lease or exchange such land to such railroad or railroads *for such purpose.*"

A long line of cases in Ohio recognize the right of the Legislature to authorize a change of use in land already appropriated

for a public purpose, and the exercise of such right can be delegated by the Legislature to a municipal or a private corporation. The only question raised in such cases has been as to the rights of the owners of "the underlying rights of property," where the title has not been held in fee.   *Malone* v. *City of Toledo,* 28 O. S., 643; *Vought* v. *Railroad Co.,* 58 O. S., 123; *Newton* v. *Railroad Co.,* 115 Fed., 781.

We find no infirmity in the legislation of 1906, and have treated of the matter at length because of the reason assigned for the alleged infirmity in the councilmanic proceedings regarding the pending appropriation proceedings.

If there is no infirmity in the law, how can there be any in the councilmanic proceedings?

The law authorizes the completion of the title to the park property for the purpose of turning over part of it for depot purposes. What taint of fraud is there in the proceedings if the councilmen had all this in their minds when they voted for the resolution upon which the proceedings depend?

What are they trying to accomplish by indirection when they follow the express language of the statute?

We find no answers to these questions which require us to grant the prayer of the petitions, either of the tax-payer or of the reversioners for an injunction against said appropriation proceedings, so far as the depot use is contemplated.

Turning now to a consideration of the lease of the *pier* in question attempted to be made by the city to the navigation companies.

This lease was authorized by an ordinance passed in November, 1909.

May 10, 1910, the Legislature passed the following act (101 O. L., 236):

"Sec. 3699-1.   All municipal corporations shall have power to construct, maintain, use and lease, or grant the right to construct, maintain and use, any pier, dock, wharf or landing for use by passenger or freight carriers, with buildings and appurtenances necessary to such use, on any land belonging to the corporation, and on and over any made or submerged land, whose title is in the corporation or the state of Ohio, in front of land belonging to the corporation.   All municipal corporations shall also have power to construct, maintain, use and lease, or grant the right

to construct, maintain and use, on and over any land belonging to the corporation and such made or submerged land, any steam, electric or street railroad tracks and appurtenances, necessary for the use of any pier, dock, wharf or landing as aforesaid. Such lease or grant may be made by the passage of an ordinance fixing its terms and conditions and by the acceptance thereof by the lessee or grantee. Land belonging to the corporation shall be construed to include also any land heretofore or hereafter appropriated or held by the corporation for streets, parks or other public purposes; but this section shall not be construed to authorize the taking of reversionary or other property rights without such compensation and proceedings as are authorized by law.''

May 31, 1910, another ordinance was passed confirming the original lease. It is claimed that the legislative act quoted authorized and made good the lease in question, for its terms are within the wording of said act.

The same line of reasoning as that which led to a conclusion that the city may be authorized to perfect its title to the park property so as to enable it to sell part thereof for depot purpose, leads to the conclusion that the act of May, 1910, is a valid enactment.

This act, by its sectional numbering, is inserted between the old and new part of the last section of the act of 1906. We treat it therefore as if it were a part of said act.

Had it been enacted in 1906, as part of said law, the only additional question to be determined would be: Is the use of the city's property for piers, docks, wharfs or landing places for passenger and freight carriers a public use of said property?

It is conceded that if exercised by the people for the benefit of all the people, it would be a public use. Indeed, if only pleasure crafts were permitted to land, it might be termed a park use.

Is it lawful, however, for the city to lease or grant to the navigation companies the right to construct, maintain and use the pier with buildings and appurtenances necessary to its use as a landing place for the passenger and freight carriers of the defendant companies only?

One objection to it raised by counsel is that the navigation companies have no power of eminent domain. A very slight in-

quiry into the nature of the business carried on by the navigation companies removes this objection.

Like the railroads, the navigation companies serve the public, the one on the land and the other on the water. Their business in other respects is identical.

For use and convenience of the public they require a wharf and proper buildings as much as the railroads require a depot; nay more, they can not deliver passengers at all without a fixed landing place, while a railroad train can stop at any place where the track runs, whether there is a depot there or not. There is more than a public *interest* in the steamboat's landing place; there is a public *use* of it.

It would seem, therefore, that there is no good reason why navigation companies should not be *directly* granted the right of eminent domain, to the end that they may better serve the public by providing proper and convenient landing-places. Landing-places proper and convenient for the *people,* as Mr. Moon said of the depot.

The Legislature appears to have authorized that such landing-places be first located and acquired by the city, and then leased or granted to navigation companies. If we are right in our conclusion that a public use is thus subserved, there can be no invalidity in the law because the city is given this oversight over the choice of location for such landing-places. There appears to be a good reason for the exercise by the Legislature of its discretion in thus *indirectly* granting to navigation companies what it has a right to, but has neglected, to grant them directly.

Such being the case, as was said of the depot proposition, there was no fraud or indirection in the passage of the ordinance to appropriate the reversioners' rights for park purposes, growing out of the intention in the minds of the councilmen to lease the pier to the navigation companies.

Having examined all objections to the appropriation proceeding, for the reasons stated, the petitions praying that they be enjoined are dismissed.

It does not follow, however, that the lease already entered into is valid. The act of May 10, 1910, itself says: "this section shall not be construed to authorize the taking of reversionary or

other property rights without such compensation and proceedings as are authorized by law.''

We interpret this as meaning that the lease can not be entered into *until* the reversionary interests have been condemned.

Without reciting the terms of the lease, it is sufficient to say that it grants to the navigation companies the full and exclusive use of the pier, with the right to construct thereon a passenger station, ticket office, and freight warehouses. The lease is for a term of forty years, revocable, it is true, on terms, and grants and provides certain railroad switch rights over the made land which, with the pier, we have found belong to the city only in easement, the underlying right belonging to the reversioners. This is placing an increased burden upon the property rights of the reversioners. It can not be placed there, under the Constitution, until they are first compensated in money therefor.

The prayer of the petition of the reversioners against the lease is granted.

So in the tax-payer's suit, seeking an injunction against the lease. The city not owning the premises in fee can not lease or grant the entire estate therein to another, which it is seeking to do. To sustain the attempt to do so would not only involve the city in needless complications, but probably result in pecuniary loss to the city. Nobody would give the full value for such a title. To permit this lease to stand would be to permit an abuse of corporate powers.

For this reason the defendants are enjoined from carrying out the terms of the lease in question.

After the city has acquired the underlying rights, this judgment will not interfere with any valid lease thereafter entered into.

Judgment in the several cases will be entered as indicated.